## Harvey Travis et al., Appts., *v.* Elias Lowry et al.

Equity will not interfere to rescind an executed contract when the parties have a full and complete remedy at law, especially if the interests of a third person are involved.

NOTE.—As held in TRAVIS V. LOWRY, a conveyance will not be rescinded except upon clear proof of fraud. Cummins v. Hurlbutt 92 Pa. 165; Murray

A conveyance of a farm worth $2,200, by a man seventy-seven years old,. and weak in body and mind, to his son-in-law, in consideration of a promise, afterward fulfilled, on the part of the latter to take care of the grantor as long as he lived, and to bury him, will not, in the absence of positive proof of fraud or duress, upon the death of the grantor within a year after the conveyance, be set aside at the instance of his heirs.

In view of all the circumstances the consideration was not grossly disproportionate to the service which the son-in-law agreed to render, for he took the risk that the grantor would live to extreme old age. That it. turned out otherwise, gave him an advantage rightly belonging to him.

(Argued February 22, 1887. Decided March 14, 1887.)

July Term, 1886, No. 163, E. D., before GORDON, TRUNKEY, STERRETT, and CLARK, JJ. Appeal from a decree of the Common Pleas of Lackawanna County dismissing a bill in equity to set aside a conveyance. Affirmed.

The facts as they appeared before the master, Henry S. Knapp, Esq., were stated in his report, which was as follows:

The plaintiffs are heirs at law of Enoch Hartman, who died at the house of his son-in-law, Elias Lowry, one of the defendants, upon the 1st day of January, 1881. The bill was filed upon December 10, 1884, and seeks to set aside the conveyance by Hartman of his farm, situate in this county, to the said defendant, Lowry.

The bill recites that Hartman being the owner of a farm of 67 acres of land, and being seventy-eight years of age and very weak and sickly both in body and in mind, was induced by the false and fraudulent representations of his son-in-law, Lowry (that the farm was heavily encumbered by judgments and mortgages, and that the creditors were about to cause it to be sold by the sheriff), to convey it to him, Lowry, upon his promise to pay off the debts; that Hartman died about four months thereafter,

---

v. New York, L. & W. R. Co. 103 Pa. 37; Cummings's Appeal, 67 Pa. 404; Kern v. Middleton, 2 Monaghan (Pa.) 687, 16 Atl. 640. The mere fact that the price is inadequate is not sufficient (Davidson v. Little, 22 Pa. 245, 60 Am. Dec. 81; Graham v. Pancoast, 30 Pa. 89) ; or the mere fact that the grantor is of weak mind, old, or infirm (Nace v. Boyer, 30 Pa. 99; Hetrick's Appeal, 58 Pa. 477; Kelly's Appeal, 108 Pa. 29), unless the grantor was incapacitated for transacting any business. Kedward v. Campbell, 166 Pa. 365, 31 Atl. 114. But a less degree of proof is required where there is mental infirmity. Jones's Appeal, 11 W. N. C. 258; Stepp v. Frampton, 179 Pa. 284, 36 Atl. 177.

Lowry meantime taking possession of the farm by virtue of his deed, which possession he held until April 14, 1884, when, fearing that the plaintiffs were about to commence legal proceedings for the recovery of the property, he entered into a conspiracy with W. D. Spencer, the other defendant, to defeat their claims, and for this purpose conveyed the said property to said Spencer.

The answer of Lowry denies all fraud or fraudulent representations upon his part to obtain the conveyance from Hartman; denies the fact of mental weakness on the part of Hartman, or that he was in any way incapacitated to make the conveyance, and denies any conspiracy with Spencer; but alleges a bona fide sale to Spencer for full consideration upon April 14, 1884, several years after the death of Hartman, and that Spencer paid him $500 in cash and gave him a mortgage for $2,000 to secure the balance of purchase money.

The answer further alleges that the conveyance from Hartman to Lowry of August 28, 1880, by the terms of which Lowry agreed to maintain and support Hartman as a member of his family, as long as the said Hartman should live, and pay for necessary medical attendance and funeral expenses, and that in consideration therefor Hartman agreed to convey to Lowry his interest in the farm in question; that, in pursuance of said contract, Hartman lived with and was supported and maintained by said Lowry from the date of the contract until the time of his death about one year later.

The answer of Spencer denies all the allegations of conspiracy between himself and Lowry, and alleges that he bought the property in good faith, for the sum of $2,500, of which sum he paid $500 in cash and gave a mortgage to Lowry for $2,000; that he had no notice of the matters of fraud alleged in the plaintiffs' bill at the time he bought the property from Lowry.

It will thus be seen that the principal questions to be determined are these: (1) Was Lowry guilty of fraudulent conduct in obtaining the conveyance from Hartman? (2) Was Hartman incapacitated, by reason of mental weakness, disease, and old age, to make a valid contract and conveyance of his interest in the land? (3) Did Spencer acquire his title with knowledge of the fraud by Lowry or incapacity of Hartman, if such fraud or incapacity existed?

A question entitled to early consideration is whether the par-

ties in interest are competent witnesses as to the matters arising
before the death of Enoch Hartman, the grantor.

The parties to the suit were all or nearly all of them sworn
before the examiner, and their testimony was taken under ob-
jection.    The thing in action is clearly the farm which was con-
veyed by the deed of Enoch Hartman; and the contract in action
is the conveyance whose validity is contested; it is likewise clear
that Enoch Hartman is the assignor of the thing or contract in
action.

Before the act of 1869 the parties to the suit would have been
incompetent to testify for any purpose.    That act does not apply
to actions where the assignor of the thing or contract in action
may be dead.    The enabling act of April 9, 1870, permits inter-
ested parties (who are excepted by the proviso to the act of
1869) to testify to matters occurring since the death of the as-
signor of the thing or contract in action.

This ruling will require the expulsion from the record of all
testimony of parties in interest, as far as that testimony relates
to matters transpiring, or existing before the death of Enoch
Hartman.

From the pleadings and so much of the testimony as appears
to be admissible under the law, the following matters of fact are
found:

First, on the 13th day of June, 1872, J. M. Seamans and
others, being the owners of a certain farm consisting of about 67
acres of land, situate in the township of Abington, in this county,
contracted, by articles, to sell the same to Enoch Hartman for the
sum of $3,000; Hartman took possession and made payments
upon the purchase money until, upon January 29, 1880, it was
all paid except the sum of $600, together with about the sum of
$30 accrued interest, the last payment upon the principal having
been made in May, 1876.    Seamans and others had assigned
their interest in the articles of agreement which by various con-
veyances had become the property of William H. Stevens.    A
deed bearing date April 1, 1873, but not acknowledged until
January 26, 1878, from Seamans and his cotenants to Hartman,
was also in possession of Stevens to be delivered to Hartman
when the purchase money was fully paid.

Second, upon January 29, 1880, Enoch Hartman was nearly
seventy-seven years of age, a widower, his wife having died near-
ly two years before, and the father of seven daughters, all of them

married, four of whom, to wit, Eurah Travis, Christiana Evans, Sarah E. Mitten, and Mary Brown, are plaintiffs in this suit, and one of whom, to wit, Emily Lowry, is the wife of Elias Lowry, one of the defendants in this suit; two of the daughters, to wit, Eliza Jane Peets and Malinda Cole, are not parties to the suit.

At the time named, Enoch Hartman had no other living children, but had two grandchildren, to wit, John H. Hartman and Christopher Hartman, sons of a deceased son, John Hartman, both of whom are also plaintiffs in this suit.

Third, on the 29th day of January, 1880, Hartman entered into a written contract with Elias Lowry, one of the defendants and husband of Emily Lowry, before named, by the terms of which Lowry agreed to maintain and support Hartman during the term of his life and pay all expenses for medical attendance and burial; in consideration whereof Hartman agreed to convey to Lowry his interest in the farm mentioned in the first finding of fact. In pursuance of this contract, Hartman became a member of Lowry's family, and so continued until he died upon the 1st day of January, 1881.

At the time this contract was entered into Hartman executed an assignment of his contract with Seamans and others, and delivered the same to Lowry, and upon August 28, 1880, in further fulfilment of said contract, he executed and delivered to Lowry a deed of the said farm. Lowry took possession of the land and paid up the balance of purchase money to Stevens, receiving the deed of Stevens and others before mentioned, which with Hartman's deed to himself was recorded in the recorder's office of Lackawanna county, upon August 28, 1880.

Lowry remained in possession of the farm until April 15, 1884, when he sold and conveyed it to W. D. Spencer, the other defendant, for the sum of $2,500,—$500 in cash, and taking a mortgage for the balance.

Fourth, for many years prior to his death Enoch Hartman was troubled by a disorder which some of the medical witnesses said was scrotal hernia, while by others it was denominated hydrocele; at any rate it had the appearance of a watery tumor in the region of the scrotum. It was so large that it might be observed when Hartman was fully clothed. This was annoying and uncomfortable at times, but was not especially painful, and did not particularly affect his general health, which was fair for a man of

advanced years; he died of cardiac dropsy, and it is thought his heart must have been somewhat affected for a year or more before his death.

Hartman felt very keenly over the loss of his wife, to whom he had been married very many years, and her death and the consequent breaking up of his home had a very depressing effect upon his spirits. He seems to have had difficulty in adjusting his domestic concerns to his liking after that event. He lived on the farm for a time without other companionship or help than a young girl whom he had taken to bring up. He then lived for a time with some of his sons-in-law. He rented the farm on shares for a time to his son-in-law, Isaiah Mitten, he occupying meantime a part of the house; during all this time he was frequently much depressed in spirits; bodily infirmities were advancing upon him; he was too old to work; his affairs were unsettled; the balance of unpaid purchase money upon his farm weighed upon his mind with a force exaggerated by his helplessness; he brooded over his troubles, and they grew greater to his mind, from too much contemplation; his intellect was weakened and somewhat disordered; his mind and memory were somewhat impaired. He did not, however, lose the use of his mental faculties; at the time he entered into the contract upon January 29, 1880, he had sufficient intelligence to understand the nature of the act he was performing and the consideration he was receiving therefor. It was his deliberate act, after mature consideration; he believed it to be the best disposition he could make of himself and his property.

Fifth, it was not established in this case that Elias Lowry represented to Hartman that the farm was encumbered by judgments or debts of any kind and was about to be sold at sheriff's sale, nor that he made any false representations to Hartman whatever; nor is it established that he persuaded Hartman or induced him to enter into the contract of January 29, 1880, or exercised any undue influence over him.

Sixth, the terms of the contract of January 29, 1880, were fully carried out upon his part by the defendant, Elias Lowry.

Seventh, upon January 29, 1880, the farm was worth from $2,800 to $3,000; Hartman's interest in it was encumbered by about the sum of $630 unpaid purchase money. The rental value of the farm was about $175 per year.

It now becomes necessary to consider the vital question in this

case, and it is a mixed question of law and of fact, to wit,—Was Hartman incapable, by reason of mental weakness, disease, and old age, upon January 29, 1880, to make, with validity, the contract with Lowry, and also to ratify it by conveying the land upon August 28, 1880? Such contracts by aged persons, for their support and maintenance during life, have frequently been made; and in the absence of fraud or lack of contractual ability they will be sustained.

Oftentimes the most beneficial arrangement a person, bereft of home comforts and desiring most of all a haven of peace and a rest from distracting cares, can make, is to barter his small accumulation of property for a life support; justice requires that contracts of such persons should not be lightly set aside; for that is the period of life when they most need to be able to use freely, for their own support and comfort, that which in their stronger years they have been able to lay aside. The evidence falls short of establishing, in the mind of the master, any degree of insanity whatever; and while there is evidenced a certain degree of weakness of body and mind, yet it is not shown that advantage was taken of such weakness.

On behalf of plaintiffs it is strenuously urged that the consideration was grossly inadequate, and that this circumstance establishes a presumption of fraud.

If the consideration can be properly considered grossly inadequate, it would be a strong point against the defendant Lowry; but of this there seems to be great doubt. When the contract was made, the amount which Lowry was to pay was entirely unascertainable. It did not appear that Hartman was suffering from any malady which was likely to speedily terminate his life. What amount of care would have to be bestowed upon him, and for what period of time? How much medical attendance might he require? While such prudence and calculation are happily not usual elements in the relation of sturdy sons to their aged parents, yet those are questions which must be considered when measuring the adequacy of the price contracted to be paid by Lowry.

Two thousand two hundred dollars would have been a fair price for Hartman's interest in the land at the time he entered into the contract, and this the master believes he was willing, after due deliberation, to exchange for a life support and the payment of various necessary expenses. No person was de-

pendent upon him for support; the contract was made with his son-in-law, in whom it may be supposed he had confidence, and in whose family it may be supposed he desired to spend the remainder of his life. Viewed as a purely business matter, it can hardly be said the contract was grossly inadequate; no effort was made, either by himself or any of his friends, to avoid it during his lifetime, and it was faithfully carried out by Lowry.

Under the whole showing the master does not consider that justice requires the deed to be set aside at this late day.

The master finds the following matters of law: (1) General weakness of mind not amounting to insanity will not, of itself, be sufficient to avoid the deed of its subject. (2) If a grantor when making a deed understands the nature of the act and its effect, and knows the consideration, and there is no fraud on the part of the grantee, the deed will generally be sustained. (3) Under all the facts shown in this case, the plaintiffs are not entitled to a decree setting aside the deed of Enoch Hartman. (4) The bill filed in this case should be dismissed.

To this report various exceptions were filed by the plaintiffs. Upon overruling the exceptions and confirming the report, ARCHBALD, A. L. J., after reviewing facts, delivered the following opinion:

Unless undue influence, fraud, or imposition appears in the case, or a relation of confidence is established between the parties, as the evidence shows that Hartman was of sufficient mental capacity to understand his acts and the effect of them, according to the decisions in Pennsylvania, the agreement is not one which equity will disturb.

In Kelly's Appeal, 15 Pittsb. L. J. 323, the plaintiff had transferred to his nephew all his property upon mere verbal promises of maintenance and trust, and himself brought a bill to rescind the arrangement. Mr. Justice GORDON, commenting upon the case, says: "On the ground of inadequacy of consideration, he (a chancellor) might interfere to protect one who had improvidently agreed to devest himself of all his property on a mere oral promise of maintenance. But it is otherwise with an executed contract. Inadequacy of consideration alone will not induce a chancellor to rescind such contract. Graham v. Pancoast, 30 Pa. 89; Aiman v. Stout, 42 Pa. 114.

"Nor according to the same authorities will mental weakness,

when not sufficient to prevent a comprehension of the contract, nor mere hardship, warrant a rescission. As to the case in hearing, the court below agrees with the auditor, that there was neither such mental incapacity on the part of the grantor as would of itself avoid his deed, nor was there evidence of actual fraud on the part of the grantee. But the case is put on the ground of constructive fraud; and Judge STORY is quoted as saying that equity will grant relief in cases where a confidence has been reposed, and that confidence has been abused. But such abuse of confidence is rather an actual than a constructive fraud. Constructive fraud is a legal implication and depends neither upon the good or bad faith of the contracting parties, as between themselves.

"Here, however, admitting the ability of the one party to contract, and the good faith of the other in accepting the benefits conferred upon him by the contract, and there is no room for the intervention of á legal policy, since by the transaction no implication can arise of the infraction either of law or public policy. We know of no obstacle, legal or moral, in the way of one who is of sane mind and free of debt, making a gift of a part or the whole of his property to another, much less in his transferring it in consideration of maintenance."

In Graham v. Pancoast, 30 Pa. 89, it is thus said by STRONG, J.: "The power of a chancellor to decree the rescission of a contract, and order its surrender, though undoubted, is one of the most delicate powers which he is ever called upon to exercise, and is never to be put forth except in a clear case. It is not sufficient to put him in motion that suspicion and distrust have been thrown over a transaction. In such a case he will move neither to rescind a contract nor to decree its specific performance. . . . Inadequacy of price, improvidence, surprise, and mere hardship have each been held sufficient to stay the active interposition of a chancellor. Yet no one of these, nor all combined, furnishes an adequate reason for a judicial rescission of a contract. For such action something more is demanded, such as fraud, mistake, or illegality. In the present case the bill of the complainant charges that the contract was obtained by fraudulent representations from an old man physically and mentally imbecile, and that the price agreed to be paid for the property was grossly inadequate. It may be observed that the false and fraudulent representations

specifically charged in the bill are but two: that the lots bargained to be sold were of the value of $5,000, and no more, and that they were in danger of being sold for taxes. Neither of these alleged representations is supported by any evidence in the cause, and they are denied in the answer. Nor, if they had been proved, are they such representations as, if false, are fraudulent. They are not such as would reasonably have been relied upon by Graham, and they constituted no material inducement to his entering into the contract. There is no relation of confidence between the vendor and vendee. In regard to the value of the lots and their liability to sale, both parties had equal means of information; and when that is the case, a representation, though untrue, will not be considered fraudulent."

Appropriate quotations illustrating the same principles might also be taken from Nace v. Boyer, 30 Pa. 99, and Hetrick's Appeal, 58 Pa. 477, but they would swell this opinion to an inordinate length.

In the case of Dean v. Fuller, 40 Pa. 474, an extreme position is taken by our supreme court, which I do not believe the court, as at present constituted, if brought to the test, would again take. The decision fails to recognize, in my opinion, the relation of confidence which existed between the contracting parties; or, as said by the learned American editor of Leading Cases in Equity (vol. 2, White & T. ed. 1877, p. 1211), the error "seems to have been in analyzing that which should have been considered as a whole. Jackson's advanced age, distress and weakness, Fuller's position as a confidential friend, and that he was present at and directed the preparation of the instrument of gift, were circumstances which, in the aggregate, threw the burden of proof on him, though each of them might have been inadequate if standing alone."

I refer to the case mainly to show that the general leaning of our highest court has not been in the line of the cases to which counsel for plaintiffs have referred me.

Beyond our own state somewhat similar limitations upon the equitable doctrine under consideration are to be found in Howe v. Howe, 99 Mass. 88; Harrison v. Guest, 6 De G. M. & G. 424, and Greer v. Greer, 9 Gratt. 332.

At the same time there are other authorities which go far to sustain the plaintiffs' case. Thus in Allore v. Jewell, 94 U. S. 511, 24 L. ed. 264, it is said by Mr. Justice FIELD:

"It may be stated as settled law that, whenever there is great weakness of mind in a person executing a conveyance of land, arising from age, sickness, or any other cause, though not amounting to absolute disqualification, and the consideration given for the property is grossly inadequate, a court of equity will, upon proper and seasonable application of the injured party, or his representatives or heirs, interfere and set the conveyance aside."

See also Harding v. Handy, 11 Wheat. 103, 6 L. ed. 429; Seeley v. Price, 14 Mich. 541; Whelan v. Whelan, 3 Cow. 537.

In 2 White & T. Lead. Cas. in Eq. pt. 2, ed. 1877, p. 1233, it is said: "Another and not unfrequent form of undue influence is where one whose mind has been enfeebled by age or disease, or who truly or erroneously considers himself unfit for the transaction of business, enters into a negotiation with a friend or relative, which results in a transfer of his property subject to a trust or in consideration of an agreement to provide for his support. . . . From the very nature of such a transaction, confidence is reposed by one party and accepted by the other; and the conveyance will not be allowed to stand, unless the grantor proceeds understandingly, deliberately, and of his own accord, nor if it appears that the grantee gained an undue advantage at the expense of the donor, or of those on whom the property would have devolved in the ordinary course of events."

I would cheerfully apply the somewhat broader doctrine of these latter authorities to the case in hand, if I did not feel myself controlled by those which I have cited from our own reports. There are many circumstances which warrant the suspicion that the transfer by Hartman was not his own free act, and no direct evidence to show that it was. The testimony of Mrs. Stevens comes nearest to establishing this; but the statements of Hartman to her, after all, amount to no more than an assertion of what he intended to do. They throw little light on how that intention was produced, which always lies at the root of the question of undue influence.

The conclusion of the master in his fourth finding of fact, that it was Hartman's deliberate act, after mature consideration, and that he believed it to be the best disposition he could make of himself and his property, I do not think has sufficient support from the evidence; and I would therefore strike it out.

But this makes no material difference. The specific charges of fraud and imposition, in the bill, are met and denied by the answer; and no competent proofs are adduced to overcome such denial.

The case then stands thus: under the authorities to which I have first above referred, and others, it is established that where no fiduciary relation is shown between the contracting parties, some element of actual fraud or imposition must be proved. But the case must proceed on one or the other of these grounds. If there was any confidential relation between the parties, then on the ground of public utility the grantee is not allowed to take any benefit to himself from the transaction, without showing the entire fairness of it, and that it was the deliberate and well formed purpose of the grantor's mind after full advice from some indifferent source. The burden in such case is upon the party seeking to sustain the transfer. He must show that the benefit he will derive from it was clearly understood and intended by the grantor. It is to be supported, not as a contract, but as a gift.

But that is not this case. There is no charge in the bill of any fiduciary relation between Hartman and Lowry at the time of the contract, or even of the deed, although the distinction between these is not material. Nor is this made out by the proofs. The most that can be said is that out of the relations of the parties a certain amount of confidence and dependence might spring. It would be natural and proper that it should. I confess that at first I was inclined to consider this as sufficient, and so require of the defendant a corresponding burden of proof. It is difficult to resist the thought that such a course would more nearly comport with justice, and that the opposite may legalize a fraud. But after a full consideration of the question, I am constrained to hold that something more than this is required, to establish the confidential relation upon which the rule in equity is based. There must exist some close relationship of blood or marriage, as of parent and child, or husband and wife, or a special relation of confidence, in accordance with which one party has customarily resorted, or does at the time resort, to the other for direction and advice in business or other intimate personal affairs. In either of these cases a dependence of the one mind upon the other necessarily results, and equity will not allow that it shall be used by the one party for his own

selfish ends. To guard against this it is presumed in a matter of advantage to the one that the mind of the other has been unduly influenced and controlled.

But the present case does not fall within these lines. It does not appear that the relations between Hartman and Lowry were in any way intimate prior to the time of the transfer. Hartman was not dependent upon his son-in-law in any way; so that we have the mere relationship by marriage, out of which to imply a confidential relation. Standing by itself it does not seem to be sufficient.

The case then falls back upon the charge of influence unduly produced by misrepresentation and fraud. While, as I have said, there are some things to arouse a suspicion of imposition upon the mind of this feeble old man, it is hardly necessary to say that the court must have something more tangible than that to act upon. Moreover, it is denied in the answer; and upon that denial the defendant has a right to stand.

The charges, therefore, in the bill upon which the case is made to depend, are not made out, and the proceedings must be dismissed.

In accordance with the views expressed in this opinion, I will sustain the fourth and thirteenth exceptions of the plaintiffs; but this does not affect the result.

Let a decree be drawn dismissing the bill, in accordance with the recommendations of the master, with costs.

The assignments of error specified the action of the court in holding that a relation of confidence had not been shown to exist between the parties in this case; in holding that because the intimate relation of the parties had existed for only a short time, it could not be treated as evidence warranting the inference of undue influence; in holding that there was no adequate evidence of actual fraud in this case to set aside the conveyance; in refusing to set aside the conveyance as prayed in the plaintiffs' bill of complaint; and in dismissing the plaintiffs' bill.

*H. M. Hannah* and *C. H. Soper,* for appellants.—A transaction of this kind requires full and complete proof of fairness and honest dealing on the part of the person who is to profit by such a conveyance. Darlington's Appeal, 86 Pa. 512, 27 Am. Rep. 726.

In the case of Boyd v. Boyd, 66 Pa. 283, no blood relation existed between the parties; they were merely friends and acquaintances who had done business for each other; and yet the court regarded it as a case where the beneficiary under the will should be called upon to assume the burden of proof and show the complete bona fides of the transaction. In Cuthbertson's Appeal, 97 Pa. 163, the same doctrine was reasserted and very clearly defined; and the law as there settled requires an explanation from the defendant which he has not made nor undertaken to make.

In Wilson's Appeal, 99 Pa. 545, the person benefited by the will was an associate and friend, but he could scarcely be supposed to have more influence than a daughter and a son-in-law. And yet the court, quoting the decision in Cuthbertson's Appeal, says: "He (the beneficiary) must make it clearly appear that the gift to him was the free and intelligent act of the testator."

A court of equity will, in favor of heirs, relieve against a contract and sale of real estate, where there has been great disparity in the mental capacities of the contracting parties; and where the inadequacy of the consideration was so gross as to leave no doubt that the vendor must have been laboring under the effect of some strong delusion in his own mind in relation to the subject; although the grantor was not, strictly speaking, a *non compos mentis*, and although it does not strictly appear that the bargain was induced by false and fraudulent affirmations on the part of the purchaser. Chitty, Contr. 10th Am. ed. p. 757.

Where the vendor was a man of a weak and eccentric disposition, and at the time of the sale was without the assistance of a disinterested legal adviser, there exists in the whole case such an inequality between the contracting parties that it is impossible for the court to recognize the claim of the defendant to hold the property for anything more than the money he has advanced upon it. Buswell, Insanity, 286, note.

While the contracts of persons not idiotic and not mentally diseased are not void because of weakness of understanding, yet when one undertakes to deal with such a person he is justly held to be under more than the usual obligation to abstain from deception; the court will regard such transactions with a jealous eye, and if it can see the least speck of imposition, or that the donor is in such a relation to the donee as may naturally give

him an undue influence over him, in a word, if there be the least scintilla of fraud, a court of equity will interpose. Cooley, Torts, 515, 516.

Inadequacy of consideration, the presence of hard and disadvantageous stipulations, or the mere fact that a right or advantage has been given or conceded, without an equivalent, will be a sufficient warrant for the interference of equity, when the weakness of the complainant, or the position held by the respondent, makes it the duty of the one to take that care of the other which the latter is unable to take of himself, although there be no actual fraud or the exercise of undue influence. Huguenin v. Baseley, 2 White & T. Lead. Cas. in Eq. pt. 2, ed. 1877, p. 1156.

The case of Harding v. Handy, 11 Wheat. (see note) 103, 6 L. ed. 429, is a case where the parties to the conveyance bore the same relation to each other as in the case at bar, that of father-in-law and son-in-law; and yet the court treated it as a case coming within the rule, and the conveyance was set aside. So in Allore v. Jewell, 94 U. S. 506, 24 L. ed. 260.

The defendant's haste in offering the property for sale and selling it exhibits clearly that he was uneasy at what he had done and was anxious to get it out of his hands to prevent the heirs from asserting their rights.

*Lemuel Amerman,* for appellee, Lowry.—Nothing but very clear error will justify an appellate court in setting aside a master's finding of fact. Burton's Appeal, 93 Pa. 214.

Where the master's findings of fact are approved by the court below, an appellate court will not set them aside, except for the clearest error. Kisor's Appeal, 62 Pa. 428; Phillips's Appeal, 68 Pa. 130; Sproull's Appeal, 71 Pa. 137.

Nothing but fraud or palpable mistake is ground for setting aside an executed contract; and the evidence of these must be clear, precise, and indubitable, and of that which occurred at the execution of the instrument. Stine v. Sherk, 1 Watts & S. 195; Irwin v. Shoemaker, 8 Watts & S. 75; Davidson v. Little, 22 Pa. 245, 60 Am. Dec. 81; Graham v. Pancoast, 30 Pa. 97; Geddes's Appeal, 80 Pa. 442; Cummins v. Hurlbutt, 92 Pa. 165, and Bierer's Appeal, 92 Pa. 265; Richards's Appeal, 39 Phila. Leg. Int. 402; Lynch's Appeal, 97 Pa. 349; Nulton's Appeal, 103 Pa. 286.

The difference between the facts and circumstances necessary to move a chancellor to refuse the execution of a contract, and those necessary to induce him to rescind it is: In one case interposition will be refused on the ground of improvidence, surprise, or even mere hardship; on the other a court will act only on the ground of fraud, illegality, or mistake. Yard v. Patton, 13 Pa. 278; Rockafellow v. Baker, 41 Pa. 319, 80 Am. Dec. 624; Edmonds's Appeal, 59 Pa. 220; Stewart's Appeal, 78 Pa. 88; Lynch's Appeal, 97 Pa. 353.

Neither inadequacy of consideration, hardship, nor mental weakness not amounting to inability to comprehend the contract, when unaccompanied by evidence of imposition or undue influence, furnishes any ground for equitable interference in setting aside an executed contract. Graham v. Pancoast, 30 Pa. 97, and Nace v. Boyer, 30 Pa. 99; Aiman v. Stout, 42 Pa. 114; Kelley's Appeal, 32 Pittsb. L. J. 328.

Under the facts in this case the court would not set aside even an unexecuted contract.

Hetrick's Appeal, 58 Pa. 477, was the case of a man who was eighty-six years of age, alone in the world, infirm in body, and feeble and weak in mind, conveying his entire estate, a house and lot worth $600, to the wife of an insolvent man, by deed in fee simple, upon the insolvent's agreement for his maintenance for life. He himself, before the contract was fully executed, prayed the court to set it aside. The court dismissed his bill.

*M. E. McDonald,* for appellee, Spencer.—The plaintiffs charge Spencer with knowledge of the matters charged against Lowry, and also that Spencer had colluded with Lowry to defraud the plaintiffs.

This allegation is fully, specifically, and absolutely denied by Spencer, in his answer and also in his testimony before the examiner.

This put the plaintiffs to the proof of the matters alleged in their bill and thus denied, by two competent and credible witnesses, or one witness and circumstances equivalent to a witness. Campbell v. Patterson, 95 Pa. 447.

They have absolutely and utterly failed to do this.

Lowry was in possession of the farm from January, 1880, until April 14, 1884, when Spencer bought it.

There were no proceedings instituted, nor was there any

notice given that the plaintiffs had or claimed to have any interest in the farm whatever. *Vigilantibus non dormientibus leges subveniunt* applies in equity as well as at law. Slemmer's Appeal, 58 Pa. 168, 98 Am. Dec. 255.

Equity will not aid one against those who have been misled by his laches. Coates v. Gerlach, 44 Pa. 43.

PER CURIAM:

The court below did well in dismissing the plaintiffs' bill. A chancellor ought not to interfere to rescind an executed contract when the parties have a full and complete remedy at law; and the more so in a case like the present where the interests of a third party are involved. Moreover, the complainants' case is unsupported by facts.

Enoch Hartman did, as he had a right to do, the best possible for himself, in providing for his own welfare in his old age; and Lowry's bargain turned out to be a good one, only because the old man died sooner than was expected. We agree with the master that the consideration received by Lowry, in view of all the circumstances, was not grossly disproportioned to the services which he agreed to render; for he had to run the risk of Hartman's living until extreme old age had made him a serious and costly charge. That it turned out otherwise was an advantage rightly belonging to Lowry, and not to Hartman's heirs.

Decree affirmed and appeal dismissed, at costs of appellants.